# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# MONROE DIVISION

**NORA WYMAN**                                    **CIV. ACTION NO. 3:23-01636**

**VERSUS**                                        **JUDGE DAVID C. JOSEPH**

**MARTIN O' MALLEY,**                             **MAG. JUDGE KAYLA D. MCCLUSKY**
**COMMISSIONER, SOCIAL**
**SECURITY ADMINISTRATION**

## REPORT AND RECOMMENDATION

Before the court is Plaintiff's petition for review of the Commissioner's denial of social security disability benefits.   The district court referred the matter to the undersigned United States Magistrate Judge for proposed findings of fact and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C).   For the reasons assigned below, it is recommended that the decision of the Commissioner be **AFFIRMED**, and this matter **DISMISSED** with prejudice.

## Background & Procedural History

Plaintiff Nora Wyman ("Wyman") protectively filed the instant application for Title II disability insurance benefits on February 9, 2019.   *See* Tr. 131, 485-491.   Wyman, who was 54 years and 9 months old as of the date she last was insured for benefits (June 30, 2018), alleged disability beginning August 15, 2015, because of depression, sciatica, degenerative disc disease, and anxiety.   (Tr. 545, 548).   The state agency denied the claim initially, and on reconsideration, on November 7, 2019, and April 21, 2020, respectively.   (Tr. 108-127, 181-184, 188-191).   Thereafter, Wyman requested and received a February 1, 2021 hearing before an Administrative Law Judge ("ALJ").   (Tr. 58-78).   In an April 20, 2021 written decision, the ALJ determined that Wyman was not disabled under the Social Security Act, finding at step four of the sequential evaluation process that she was able to return to past relevant work as an

automobile salesperson, both as actually and generally performed.   (Tr. 128-138).   Wyman petitioned the Appeals Council to review the unfavorable decision.

On July 19, 2021, the Appeals Council granted the request for review, vacated the ALJ decision, and remanded the case for further proceedings because of inconsistencies in the ALJ's residual functional capacity assessment, as well as her citation to an incorrect Dictionary of Occupational Titles number at step four of the analysis.   (Tr. 144-149).

Pursuant to the remand order, the same ALJ held a second administrative hearing on February 10, 2022.   (Tr. 37-57).   However, in a March 16, 2022 written decision, the ALJ again determined that Wyman was not disabled under the Social Security Act, finding at step five of the sequential evaluation process that she was able to make an adjustment to work that exists in significant numbers in the national economy.   (Tr. 150-163).

Wyman returned to the Appeals Council for review, whereupon the Appeals Council again granted the request, vacated the ALJ decision, and remanded the case to a new ALJ for further proceedings.   (Tr. 170-176).   In so doing, the Appeals Council noted that the sit/stand limitation recognized by the ALJ had to be specific regarding frequency, there was a discrepancy regarding the ALJ's step four finding, and the ALJ failed to consider whether the claimant had a borderline age situation in her step five determination.   *Id*.

Pursuant to the remand order, a different ALJ held a third administrative hearing on March 14, 2023.   (Tr. 79-107).   However, in an April 19, 2023 written decision, the latest ALJ determined that Wyman was not disabled under the Social Security Act, finding at step four of the sequential evaluation process that she was able to return to past relevant work as a salesperson, as that job generally was performed in the national economy.   (Tr. 8-24).   Wyman appealed the adverse decision to the Appeals Council.   However, on September 22, 2023, the

Appeals Council denied Wyman's request for review; thus, the ALJ's decision became the final decision of the Commissioner.   (Tr. 1-4).

On November 20, 2023, Wyman filed the instant complaint for judicial review of the Commissioner's final decision.   Following submission of the administrative transcript and supporting memoranda, the matter is now before the court.

### Standard of Review

This court's standard of review is (1) whether the final decision is supported by substantial evidence, and (2) whether the Commissioner applied the proper legal standards to evaluate the evidence.   *Keel v. Saul*, 986 F.3d 551, 555 (5th Cir. 2021) (citation omitted).   The Supreme Court has emphasized that

> [t]he phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding.   Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations.   And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla."   It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Biestek v. Berryhill*, 587 U.S. 97, 102-103 (2019) (internal citations omitted).   The reviewing court may not reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner.   *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

Upon finding substantial evidence, the court may only review whether the Commissioner has applied proper legal standards and conducted the proceedings consistently with the statute and regulations.   *Carter v. Heckler*, 712 F.2d 137, 140 (5th Cir. 1983).   In other words, where the Commissioner's decision is supported by substantial evidence, the findings therein are conclusive and must be affirmed – *unless* the Commissioner applied an incorrect legal standard

that materially influenced the decision.   *See* 42 U.S.C. § 405; *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000); *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001).

## **Determination of Disability**

Pursuant to the Social Security Act ("SSA"), individuals who contribute to the program throughout their lives are entitled to payment of insurance benefits if they suffer from a physical or mental disability.   *See* 42 U.S.C. § 423(a)(1)(D).   The SSA defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . ."   42 U.S.C. § 423(d)(1)(A).   A disability may be based on the combined effect of multiple impairments which, if considered individually, would not be of the requisite severity under the SSA.   *See* 20 C.F.R. § 404.1520(a)(4)(ii).   Based on a claimant's age, education, and work experience, the SSA utilizes a broad definition of substantial gainful employment that is not restricted by a claimant's previous form of work or the availability of other acceptable forms of work.   *See* 42 U.S.C.§ 423(d)(2)(A).

The Commissioner of the Social Security Administration has established a five-step sequential evaluation process that the agency uses to determine whether a claimant is disabled under the SSA.   *See* 20 C.F.R. §§ 404.1520, 416.920.   The steps are as follows,

(1)   An individual who is performing substantial gainful activity will not be found disabled regardless of medical findings.

(2)   An individual will be found not disabled if he or she does not have a "severe impairment," or a combination of impairments that is severe, and of the requisite duration.

(3)   An individual whose impairment(s) meets or equals a listed impairment in [20 C.F.R. pt. 404, subpt. P, app. 1], and meets the duration requirement,

will be considered disabled without the consideration of vocational factors.

Before proceeding to step four, the Commissioner assesses the individual's residual functional capacity, which is used at both step four and step five to evaluate the claim.

(4)    If an individual's residual functional capacity is such that he or she can still perform past relevant work, then a finding of "not disabled" will be made.

(5)    If an individual is unable to perform past relevant work, then other factors including age, education, past work experience, and residual functional capacity must be considered to determine whether the individual can make an adjustment to other work in the economy.   If the individual can make such an adjustment, then he or she will be found not disabled.   If the individual is unable to adjust to other work, then he or she will be found disabled.

*See Boyd v. Apfel*, 239 F.3d 698, 704 -705 (5th Cir. 2001); 20 C.F.R. §§ 404.1520, 416.920.

When a finding of "disabled" or "not disabled" may be made at any step, a decision will be rendered at that point without proceeding to the remaining steps.   20 C.F.R. §§ 404.1520, 416.920; *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990).   "The claimant bears the burden of proof on the first four steps, but the Commissioner bears the burden on the fifth step."   *Salmond v. Berryhill*, 892 F.3d 812, 817 (5th Cir. 2018) (citation omitted).

## The ALJ's Findings

### I.    Steps One, Two, and Three

The ALJ determined at step one of the sequential evaluation process that the claimant did not engage in substantial gainful activity during the relevant period, which extended from her alleged onset date of August 15, 2015, through the date she last was insured for benefits on June 30, 2018.   (Tr. 14-18).   At step two, he found that the claimant suffered severe impairments of degenerative disc disease, degenerative joint disease, and chronic obstructive pulmonary disease

(COPD).  *Id.*[1]   He concluded, however, that the impairments were not severe enough to meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4, at step three of the process.  *Id.*

## II.    Residual Functional Capacity

The ALJ next determined that the claimant retained the residual functional capacity ("RFC") to perform a range of light work,[2] except that she was limited to occasional overhead reaching bilaterally and occasional exposure to fumes, odors, dusts, gases, and poor ventilation. (Tr. 18-22).

## III.    Step Four

With the assistance of a vocational expert, the ALJ determined at step four that the claimant was able to return to her past relevant work as a salesperson, Dictionary of Occupational Titles ("DOT") Code # 273.35-010, as the work is performed generally in the

---

[1] The ALJ determined that the claimant's medically determinable impairments of cholelithiasis, bronchitis, depression, and anxiety were non-severe.  *Id.*   In addition, he found that her allegation of attention deficit disorder did not constitute a medically determinable impairment. *Id.*

[2]  Light work entails:

> . . . lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. §§ 404.1567(b), 416.967(b).

national economy.   (Tr. 22-23).[3]

<u>**Analysis**</u>

Wyman advanced two errors in support of reversal and remand:

I.      **Remand is required because the ALJ failed to either adopt mental limitations he found credible in his residual functional capacity (RFC) or to explain why he was omitting these credible mental limitations.**

II.     **Remand is required because the ALJ relied solely upon his own lay judgment in formulating the residual functional capacity (RFC), while failing to develop the medical record.**

Wyman's assignments of error both challenge the ALJ's RFC determination, i.e., the "interregnum between the third and fourth steps";[4] thus, there is some overlap between the issues.   However, because the evidence and circumstances pertaining to the second assignment of error provide some context for the first, the Court will address Wyman's arguments in reverse order.

Before proceeding further, it is important to stress that the relevant period at issue for this disability application spans the period from Wyman's alleged disability onset date of August 15, 2015, through June 30, 2018, the date that she last was insured for benefits, i.e., her "DLI." Therefore, to prove that she is entitled to Title II disability insurance benefits, Wyman must establish disability by June 30, 2018.   *See Knight v. Soc. Sec. Admin.*, Civ. Action No. 20-0825, 2021 WL 2404071, at *8 (E.D. La. May 26, 2021), *R&R adopted,* 2021 WL 2402208 (E.D. La. June 11, 2021) (citation omitted).   "Medical evidence that is dated after the date last insured is

_____

[3] Past relevant work is defined as "the actual demands of past work or 'the functional demands . . . of the occupation as generally required by employers throughout the national economy.'" *Jones v. Bowen*, 829 F.2d 524, 527 (5th Cir. 1987) (citing, Social Security Ruling 82-61).

[4] *Vasquez v. O'Malley*, No. 24-50233, 2024 WL 4381269, at *1 (5th Cir. Oct. 3, 2024) (unpubl.).

7

relevant only to the extent that it might establish that the claimant was disabled as of the date last insured." *Id.*

In his decision, the ALJ reviewed the available evidence, including the hearing testimony, the medical records, and the impressions of the non-examining state agency medical consultants. (Tr. 18-22). In deriving Wyman's RFC, the ALJ stated that he "made no persuasive finding" regarding the reports from the agency medical consultants because they declined to furnish an opinion regarding Wyman's RFC on the basis that the record contained "insufficient evidence prior to the date last insured."[5] (Tr. 15, 21-22).

Wyman faults the ALJ for his failure to assess the persuasiveness of the state agency medical consultants, which represented the only medical opinions in the record. Even so, Wyman must show that the alleged error was harmful, i.e., that she was prejudiced thereby. *Miller v. Kijakazi*, No. 22-60541, 2023 WL 234773, at *3 (5th Cir. Jan. 18, 2023); *Walker v. Kijakazi*, No. 23-60116, 2023 WL 7443302, at *4 (5th Cir. Nov. 9, 2023) (citing *Jones v. Astrue*, 691 F.3d 730, 734 (5th Cir. 2012)).

Wyman's arguments seem to suggest that if the ALJ *had* credited the medical

---

[5] On November 4, 2019, non-examining agency medical consultant, Forrest Wright, M.D., reviewed the record and noted that Wyman complained of sciatica and degenerative disc disease, along with mental health issues. (Tr. 113-114). The medical record showed complaints of back pain during the period of DLI, but exams revealed normal range of motion, gait, and strength. *Id.* Subsequent x-rays showed normal lumbar spine. *Id.* Wyman had been treated for pneumonia with a subsequent chest x-ray described as without abnormalities. *Id.* Ultimately, Dr. Wright concluded that the exams and available medical records were inadequate to assess a level of limitation during the DLI. *Id.*

On April 21, 2020, non-examining agency medical consultant, Gerald Dzurik, M.D., reviewed the record, remarked that there was no new medical evidence for the relevant time period, and, therefore, concluded that there still was insufficient evidence to fully assess conditions or functionality for the relevant period. (Tr. 123-124).

consultants' findings that there was insufficient evidence in the record, *then*, under the regulations, he should have taken additional action.    However, the regulations provide that, if the evidence is insufficient to determine whether a claimant is disabled, then the ALJ *may* take one or more additional actions, such as recontacting a medical source, requesting additional existing evidence, asking the claimant to undergo a consultative examination, or asking the claimant or others for more information.    20 C.F.R. § 404.1520b(b)(2)(i)-(iv).    Yet, by its terms, § 404.1520b(b) is couched in permissive, not mandatory terms.    Further, Wyman has not shown that any of the additional actions available under § 404.1520b(b) would have made a difference in this case.[6]

    For example, Wyman did not adduce information from any medical source to establish that she had limitations prior to her DLI that were inconsistent with the ALJ's RFC.    She also failed to identify any specific evidence that the ALJ may have omitted.    Certainly, a consultative physical examination in 2023 would have been of little utility for the purpose of assessing the effects of Wyman's progressively worsening impairments prior to her DLI in June 2018. Furthermore, there is nothing to suggest that another medical consultant would have been any more willing to answer interrogatories regarding the effects of Wyman's impairments, than the agency medical consultants who had demurred previously.    In short, Wyman has not established prejudicial error.[7]

---

[6] The ALJ's duty to develop the record must be balanced against the claimant's burden of proving disability through Step Four of the sequential evaluation process, including the RFC stage.    *Vasquez*, 2024 WL 4381269, at *2.    A claimant's arguments on record sufficiency lose much of their force, when, as here, the claimant was represented by counsel during the administrative process, but neither pressed for a consultative examination to assess her limitation nor offered medical testimony at the hearing.    *Id.*

[7] To obtain reversal due to the ALJ's failure to adequately develop the record, the claimant must

Wyman further contends that, in the absence of any medical opinions regarding the effects of her impairments, the ALJ effectively conjured up her RFC by relying on his own lay speculation of the medical evidence, i.e., he committed a "*Ripley* error."  *See Keel v. Saul*, 986 F.3d 551, 555 (5th Cir. 2021) (describing a *Ripley* error).[8]  Nonetheless, the absence of a medical source statement, "does not, in itself, make the record incomplete."  *Ripley*, 67 F.3d at 557; *Vasquez*, 2024 WL 4381269, at *2.   In such a situation, the court's inquiry properly "focuses upon whether the decision of the ALJ is supported by substantial evidence in the existing record."  *Id*.   Of course, "[a] finding of no substantial evidence is appropriate *only if* no credible evidentiary choices or medical findings support the decision."  *Vasquez*, 2024 WL 4381269, at *2 (quoting *Whitehead v. Colvin*, 820 F.3d 776, 779 (5th Cir. 2016)) (emphasis added).

Upon review, the undersigned finds that the ALJ's RFC is supported by substantial evidence.   To be sure, the instant medical record is sparse, but may be summarized, as follows:

From June 27, 2016, through October 19, 2016, Wyman went to the chiropractor up to two times per week, primarily for left arm and shoulder pain.   (Tr. 804-810).   However, the symptoms appeared to resolve with treatment.   *Id*.

On April 1, 2017, Wyman went to the emergency room with complaints of fever and a

---

demonstrate resulting prejudice.  *Brock v. Chater*, 84 F.3d 726,728 (5th Cir. 1996).   "To establish prejudice, a claimant must show that [s]he could and would have adduced evidence that might have altered the result."  *Id.*   (Internal quotes omitted).

[8]  *Ripley* refers to the Fifth Circuit's decision in *Ripley v. Chater,* where the court held that "an ALJ may not—without opinions from medical experts—derive the applicant's residual functional capacity based solely on the evidence of his or her claimed medical conditions. Thus, an ALJ may not rely on his own unsupported opinion as to the limitations presented by the applicant's medical conditions."  *Williams v. Astrue*, 355 Fed. App'x. 828, 832 n.6 (5th Cir. 2009) (citing *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995)).

sore throat that began one day earlier.   (Tr. 693-696).   She was discharged, with an impression of "viral agents" as the cause of her symptoms.   *Id*.   No cognitive or functional deficits were noted.   *Id*.

On June 7, 2017, Wyman went to the emergency room with complaints of shortness of breath.   (Tr. 700-706).   It was noted that she had past medical history for depression and GERD.   *Id*.   However, she demonstrated a full range of motion, with no spinal tenderness.   *Id*. She also had 5/5 motor strength in all extremities, with a normal gait.   *Id*.   Her behavior, mood, and affect all were within normal limits.   *Id*.   A chest x-ray showed a minimal increase in the interstitial marking of the right lower lung, which was questionable for minimal pneumonia.   *Id*. She was discharged after three hours, with a diagnosis of COPD and an acute lower respiratory infection.   *Id*.

Wyman returned to the chiropractor on December 4, 2017, with complaints of right anterior leg pain.   (Tr. 803).   Again, she responded well to treatment.   *Id*.

On February 20, 2018, Wyman went to the emergency room with complaints of right upper rib pain that began when she had fallen one day earlier.   (Tr. 716-720).   However, she exhibited a full range of motion, with 5/5 motor strength in all extremities, and a normal gait. *Id*.   Her behavior, mood, and affect were within normal limits.   *Id*.   She used tobacco products every day and had mild, scattered wheezing.   *Id*.

On December 16, 2018, almost six months after her DLI, Wyman went to the emergency room with complaints of acute pain in her lower back that radiated down her legs for the past three days.   (Tr. 724-727, 790-795).   The problem was described as "new."   *Id*.   She was positive for decreased range of motion and moderate pain with movement.   *Id*.   Straight leg raises elicited pain bilaterally, and her gait was limited by pain.   *Id*.   However, x-rays of the

11

lumbosacral spine show no more than mild disc space narrowing at L5/S1.   *See* Tr. 728-729, 796-797.   She had no respiratory, cognitive, or functional deficits.   (Tr. 724-727).   She was discharged with a diagnosis of low back pain.   *Id*.

On January 9, 2019, Wyman returned to the emergency room with complaints of pain between her shoulders that "shot through to her chest," plus left arm weakness and tingling in her legs.   (Tr. 731-736, 822-863).   The pain between her shoulders had started that day.   *Id*.   Her past medical history included anxiety.   *Id*.   She was a current every-day smoker but denied shortness of breath.   *Id*.   She was positive for cough, but negative for chest tightness and wheezing.   *Id*.   She exhibited a normal range of motion.   *Id*.   She was discharged with a diagnosis of musculoskeletal back pain.   *Id*.

On February 5, 2019, Wyman presented to physical therapy with complaints of low back pain that had commenced eight months earlier.   (Tr. 994-997).   She reported that she had experienced problems with her back pain for years, but it had progressively worsened.   *Id*.   She had a burning pain/numbness that radiated into the anterior aspect of her right thigh.   *Id*.   She stated that an x-ray had revealed narrowing disc space in the lumbar spine.   *Id*.   Before the injury onset date, she was able to walk and move around.   *Id*.

On February 12, 2019, Wyman underwent a psychiatric evaluation with Aruna Gullapalli, M.D.   (Tr. 762-766).   She represented that she had a long history of depression that had started in her teens, but she had been feeling worse, with suicidal ideation for the past two months.   *Id*.   The severity of her impairment was moderate.   *Id*.   Wyman described crying spells and an anxious mood, with daily panic attacks.   *Id*.   Her sister recently had been diagnosed with stage four throat cancer.   *Id*.   She disclosed prior suicide attempts, with two, in-patient psychiatric treatments.   *Id*.   Attention and concentration were good, and she had an average IQ.   *Id*.

Gullapalli diagnosed major depression, recurrent, without psychotic features, moderate in severity, with a Global Assessment of Functioning ("GAF") score of 50,[9] with the highest score in the past year of 70.[10]  *Id.*[11]

A November 18, 2019 initial examination for physical therapy reveals that Wyman had been experiencing right shoulder pain for the past three to four months when she pulled on a light cord awkwardly.  (Tr. 786-788).   She had attempted chiropractic treatment and injections with no relief.  *Id*.  Wyman reported significant pain in her right shoulder with inability to reach above her head.  *Id*.  She explained that she had been prescribed Tramadol but did not take it regularly because she had better relief with Ibuprofen.  *Id*.

At her July 28, 2020 occupational therapy session, Wyman reported a five-to-six-month history of left shoulder pain with decreased motion.  (Tr. 945-946).   She had attempted conservative treatment inconsistently with poor results and, therefore, on May 22, 2020, had submitted to surgery to address adhesive capsulitis.  *Id*.   Since the surgery, Wyman still had

---

[9]  "GAF is a standard measurement of an individual's overall functioning level 'with respect only to psychological, social, and occupational functioning.'"  *Boyd*, 239 F.3d at 701 n.2 (citing AMERICAN PSYCHIATRIC ASS'N DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS at 32 (4th ed. 1994) (DSM-IV)).

A GAF of 50 indicates "**[s]erious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job).  The Court acknowledges that the GAF has fallen out of favor in the mental health community.   However, it still serves to document the provider's assessment of the individual's overall functioning level, for the period specified.

[10]   A GAF of 61-70 denotes "**[s]ome mild symptoms** (e.g., depressed mood and mild insomnia) **OR some difficulty in social, occupational, or school functioning** (e.g., occasional truancy, or theft within the household), **but generally functioning pretty well, has some meaningful interpersonal relationships.**  DSM-IV, pg. 32.

[11]  Wyman returned to Dr. Gullapalli for further treatment sessions in March, April, May, and September 2019.   (Tr. 754-762, 768-769).

pain, but motion in her left shoulder had increased.   *Id*.

At an August 12, 2020 occupational therapy session, Wyman disclosed that she was able to *work with her husband building wooden shutters and fences*, but remained limited on what she could do.   (Tr. 934-935).   She continued to present with increased tightness and stiffness at the glenohumeral joint, which limited her range of motion in, and functional use of her left upper extremity.  *Id*.

At a March 7, 2023 visit with her treating physician, Dr. Unkel noted that Wyman was negative for musculoskeletal and psychiatric issues.   (Tr. 1016-1017).

The ALJ weighed the foregoing medical treatment records and Wyman's testimony, but ultimately concluded that,

> the claimant's allegations of severity during the period at issue is not consistent with the objective evidence. Although the evidence indicates a degree of impairment, the overall record does not fully support the claimant's allegations of severity during the period at issue that spanned 2015 to 2018. In particular, the undersigned has considered the claimant's reports of being unable to stand or walk for about 15 minutes and sit for about 30 minutes. The undersigned also considered her reports of pain and problems sleeping at night with the only comfortable position being on her recliner. However, these reports are not reflected in the records available from 2015 through 2018. While the claimant complained of back and shoulder pain, these complaints were not of the same magnitude as those at the hearing.   Nor were they reflected in the physical examinations available from that time.   The undersigned has considered the more acute picture presented by the claimant's emergency room visit in January 2019.   However, those symptoms were effectively treated with an injection and, given the mild findings on objective imaging from that time, appeared to be muscle strain.   Even though there is evidence of worsening musculoskeletal symptoms several years after the date last insured, the evidence available does not provide a sufficient bridge to connect the two periods that are so far apart in time.   Consequently, the undersigned finds that the claimant's musculoskeletal impairments, considered singularly and in combination, were adequately accommodated by limiting her to light work with occasional overhead reaching.   Additionally, due to the claimant's sporadic need for respiratory treatment and lack of additional complications or workup during the period at issue, the undersigned finds that her breathing impairment is adequately accommodated by the limitations of light work and restricting her to occasional exposure to fumes, odors, dusts, gases and poor ventilation.

14

(Tr. 22).

In other words, the ALJ reduced Wyman's RFC to a limited range of light work, which represents a serious and significant limitation of functioning to account for the effects of her impairments.   Given the limited treatment records or evidence of limitations prior to DLI, the ALJ's assessment appears more than fair, and, in fact, quite generous.   For example, while Wyman reported some arm and shoulder pain in 2016, the symptoms resolved within a few months, and, consequently, did not meet the SSA's duration requirement.   *See* 20 C.F.R. § 404.1509.   Furthermore, while the treatment record contains a lone reference to COPD at an emergency room visit, Wyman denied suffering from COPD at the administrative hearing, explaining that she had recurring bronchitis only about twice per year.   (Tr. 92).   In addition, there is no evidence that Wyman's degenerative disc and joint disease had progressed to the point that it caused her to seek medical treatment for the condition prior to DLI.   Finally, Wyman did not identify any instances in the administrative record where her treating medical providers imposed any long-lasting limitations of functioning greater than the limitations recognized by the ALJ.

With regard to her mental impairments of depression and anxiety, Wyman contends that the ALJ erred in his RFC assessment by failing to account for any mental limitations of functioning, despite previously finding at step two of the sequential evaluation process that Wyman's impairments caused mild limitations in each of the four broad areas of mental functioning.   In support of her argument, Wyman cites a litany of non-binding cases that found reversible error under similar circumstances.   *See, e.g.*, *Richardson v. Saul*, 511 F.Supp.3d 791, 799 (E.D. Ky. 2021); *Kich v. Colvin*, 218 F.Supp.3d 342, 357 (M.D. Pa. 2016); *Johnson v.*

*O'Malley*, Civ. Action No. 23-0255, 2024 WL 3169021, at *5 (S.D. Tex. June 25, 2024), *R&R adopted,* 2024 WL 4374127 (S.D. Tex. Oct. 2, 2024).

It is manifest that when evaluating the severity of mental impairments, the Commissioner is obliged to apply a "special technique."  20 C.F.R. § 404.1520a.  If the Commissioner determines that the claimant has a medically determinable mental impairment(s), then the Commissioner must rate the degree of functional limitation resulting from the impairment(s). 20 C.F.R. § 404.1520a(b).  The four broad functional areas track the same areas contemplated in paragraph B of the mental impairment listings, i.e., understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself.  20 C.F.R. § 404.1520a(c).  The special technique is completed at the initial, reconsideration, and at the administrative law judge levels.  20 C.F.R. § 404.1520a(e).

In this case, the ALJ applied the special technique and found that Wyman's mental impairments resulted in "mild" limitations of functioning in each of the four broad functional areas.  (Tr. 15-16).[12]  The ALJ acknowledged that the limitations identified in the "paragraph B" criteria were not a residual functional capacity assessment, and that the mental RFC used at steps four and five of the sequential evaluation process required a more detailed assessment. (Tr. 16).  Of course, the ALJ did not adopt any limitations in mental functioning in his RFC, and did not explain his reasons for omitting same, *within the RFC section of his decision*.  (Tr. 16-18).

Nevertheless, other courts have recognized that "it is *not* the case that whenever an ALJ

---

[12]  Under the regulations, a "mild" limitation is defined as "[the claimant's] functioning in this area independently, appropriately, effectively, and on a sustained basis is slightly limited."  20 C.F.R. Pt. 404 Subpt. P, Appx. 1, § 12.00F(2)(b).

conducts a severity analysis at step two with respect to mental impairments and finds mild limitations, then the ALJ is required to include mental limitations in the RFC assessment." *Barnes v. Kijakazi*, Civ. Action No. 22-0699, 2024 WL 2228759, at \*3 (S.D. Miss. Jan. 30, 2024), *R&R adopted,* 2024 WL 2212370 (S.D. Miss. May 16, 2024) (collecting cases) (emphasis added) (internal quotation marks omitted).   "Further, the ALJ is not necessarily required to incorporate step two findings of mild and non-disabling mental limitations into the RFC determination."   *Chapelle v. Kijakazi*, 6:22-CV-05296, 2023 WL 6845862, at \*3 (W.D. La. Oct. 16, 2023) (Summerhays, J.).[13]   Rather, "[i]f mental functioning has no impact on a claimant's ability to work, then it will not be incorporated into the final RFC assessment."   *Id*. (citation omitted).

In this case, the ALJ concluded his step two analysis by stating that his subsequent RFC reflected the degree of limitation he had found in the "paragraph B" mental function analysis. (Tr. 16).[14]   Clearly, his ensuing RFC did not incorporate any limitations pertaining to mental impairments, which means that he implicitly found that the "minimal" limitations that he recognized in his application of the special technique did not translate into any meaningful limitations of functioning, for the period at issue.   The ALJ's finding is supported by his rationale for his "paragraph B" findings, where he repeated the refrain that there were no

---

[13]  Recently, in *Vasquez v. O'Malley*, the Fifth Circuit found no error where the ALJ did not assign any limitations of function related to the claimant's esophageal condition, which was the only medical impairment that the ALJ had assessed as "severe" at step two of the analysis. *Vasquez*, 2024 WL 4381269, at \*2.   The court observed that the ALJ considered the "combined symptoms" of the claimant's impairments when assessing the RFC, which otherwise was supported by substantial evidence.   *Id*.

[14]  He also dutifully recited the maxim that, in assessing the RFC, he is obliged to consider all of the claimant's impairments, including those that are not severe.   (Tr. 13).

consistent reports or objective signs of limitation of functioning from the alleged disability onset date through the DLI (June 30, 2018).   (Tr. 15-16).

Indeed, it bears repeating that Wyman did not seek treatment for depression until well after DLI.   *See* discussion, *supra*; *Garcia v. Berryhill*, 880 F.3d 700, 705 n.6 (5th Cir. 2018) (no medical evidence that claimant had seen doctor before his insured status expired).   Moreover, her anxiety principally manifested itself only around anniversary dates associated with specific past traumatic events.   *See* Tr. 68.   Furthermore, while the ALJ did not embrace the findings of the state agency medical consultants, they uniformly determined that the evidence did not support a finding that, prior to DLI, Wyman had a medically determinable mental impairment at all.[15]

In sum, the undersigned finds that there is substantial evidence to support the ALJ's decision not to include any mental limitations in his residual functional capacity assessment. *See Barnes*, 2024 WL 2228759, at *4.   To the extent that the ALJ may have erred in how he structured his decision (by including a discussion of Wyman's mental impairments only in his step two analysis), any error was harmless, i.e., Wyman was not materially prejudiced thereby. *See Jeansonne v. Saul*, 855 Fed. App'x. 193, 197–98 (5th Cir. 2021) (because substantial evidence showed that the claimant's mild limitations from depression and anxiety did not significantly affect her ability to work, the ALJ did not err in declining to consider her mental

---

[15]  On November 4, 2019, non-examining agency psychologist, Cynthia Lindsey, Psy.D. reviewed the record and completed the special technique, finding that Wyman had no medically determinable mental impairment prior to her DLI.   (Tr. 114).   On April 21, 2020, non-examining agency psychologist, James Pinkston, Ph.D., reviewed the record and opined that there was insufficient evidence to support any medically determinable mental impairment prior to DLI.   (Tr. 124-125).   Thus, the opinions provide a baseline of support for the ALJ's subsequent RFC.

impairments at step five of the analysis).

## <u>Conclusion</u>

The Commissioner in this case was tasked with determining whether the claimant was disabled.   In so doing, he considered the claimant's testimony, the medical record, and expert opinion evidence.   The evidence was by no means uniform and could have supported a different outcome.   Such conflicts in the evidence, however, are for the Commissioner to resolve. *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990) (citation omitted); *Grant v. Richardson*, 445 F.2d 656 (5th Cir. 1971) (citation omitted).   This court may not "reweigh the evidence in the record, try the issues de novo, or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision."   *Newton*, 209 F.3d at 453.   That is not to say that the Commissioner's decision is blemish-free, but procedural perfection in the administrative process is not required,[16] and any errors do not undermine confidence in the decision.   Accordingly,

IT IS RECOMMENDED that the Commissioner's decision be AFFIRMED, in its entirety, and that this civil action be DISMISSED with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.   A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.   A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.   Timely objections will be considered by the District Judge before a final ruling issues.

---

[16] *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir.1988).

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, on this 18th day of November, 2024.

KAYLA DYE MCCLUSKY
UNITED STATES MAGISTRATE JUDGE